RCH:KTF/JRS
F. #2019R001072

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF

a) ONE APPLE IPHONE IN A BLUE CASE USED BY MARSISTE ADOLPHE;

b) ONE ROSE GOLD APPLE IPHONE IN A CLEAR CASE USED BY MARGARET DOMINIQUE-MCLAIN;

c) ONE APPLE IPHONE IN A GEMSTONE CASE USED BY MARGARET DOMINIQUE-MCLAIN;

d) ONE SILVER APPLE IPHONE USED BY MERCEDES FALCON;

e) ONE BLACK APPLE IPHONE USED BY TRACY GIBSON;

f) ONE ROSE GOLD APPLE IPHONE USED BY ROSELEE JOHNSON;

g) ONE APPLE IPHONE IN A BLACK RUBBER CASE USED BY MANUEL MOORE;

h) ONE APPLE IPHONE IN A PURPLE GEMSTONE CASE USED BY KIKELOMO OGUNDIRAN; AND

i) ONE BLACK APPLE IPHONE IN A CLEAR CASE USED BY DINO PAOLICELLI,

CURRENTLY IN THE POSSESSION OF LAW ENFORCEMENT IN BROOKLYN, NEW YORK

**APPLICATION FOR A SEARCH WARRANT FOR ELECTRONIC DEVICES**

Case No. 21-MJ-1228

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, Angel Agesta, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a search warrant authorizing the examination of

property—nine electronic devices—which are currently in law enforcement possession, and the

extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (the "FBI")

and have been since 2018.  As an FBI Special Agent, I am a "federal law enforcement officer"

within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government

agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to

request a search warrant.  I have participated in numerous investigations into fraudulent conduct,

including theft of government funds, as well as investigations involving search warrants,

including search warrants relating to mobile telephones.  As a result of my training and

experience, I am familiar with certain indicators of fraudulent conduct and the capacities of

cellular telephones.

3.      This affidavit is intended to show only that there is sufficient probable

cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.      The property to be searched is listed and shown below and in Attachment

A:

- ONE APPLE IPHONE IN A BLUE CASE USED BY MARSISTE ADOLPHE;

2

- ONE ROSE GOLD APPLE IPHONE IN A CLEAR CASE USED BY MARGARET DOMINIQUE-MCLAIN;

- ONE APPLE IPHONE IN A GEMSTONE CASE USED BY MARGARET DOMINIQUE-MCLAIN;

- ONE SILVER APPLE IPHONE USED BY MERCEDES FALCON;

- ONE BLACK APPLE IPHONE USED BY TRACY GIBSON;

- ONE ROSE GOLD APPLE IPHONE USED BY ROSELEE JOHNSON;

- ONE APPLE IPHONE IN A BLACK RUBBER CASE USED BY MANUEL MOORE;

- ONE APPLE IPHONE IN A PURPLE GEMSTONE CASE USED BY KIKELOMO OGUNDIRAN; AND

- ONE BLACK APPLE IPHONE IN A CLEAR CASE USED BY DINO PAOLICELLI,

hereinafter the "SUBJECT DEVICES." The SUBJECT DEVICES are depicted below; the two belonging to Dominique-Mclain are shown below the others, which are labeled with the relevant Defendant's name.







The SUBJECT DEVICES are currently in the possession of the FBI within the Eastern

District of New York.

5.      The applied-for warrant would authorize the forensic examination of the

SUBJECT DEVICES by law enforcement personnel, including personnel from both the FBI and

the New York City Department of Investigation ("DOI"), for the purpose of identifying

electronically stored data comprising evidence, instrumentalities, contraband and/or fruits of

violations of federal criminal law, including Theft Concerning Programs Receiving Federal

Funds, in violation of 18 U.S.C. § 666(a)(l)(A), and Health Care Fraud, in violation of 18

U.S.C. § 1347 (the "SUBJECT OFFENSES"), further described in Attachment B.

4

**PROBABLE CAUSE**

6.      On October 22, 2021, the Honorable Ramon E. Reyes, Jr., United States

Magistrate Judge for the Eastern District of New York, signed a complaint and issued arrest

warrants authorizing the arrest of MARSISTE ADOLPHE, MARGARET DOMINIQUE-

MCLAIN, MERCEDES FALCON, TRACY GIBSON, ROSELEE JOHNSON, JEANNETTE

MONCLOVA, MANUEL MOORE, KIKELOMO OGUNDIRAN, and DINO PAOLICELLI

(collectively, "the Defendants") for violations of the SUBJECT OFFENSES.  See United States

v. Adolphe et al., No. 21-MJ-1205 (the "Complaint").  The Complaint is attached hereto as

Attachment C and incorporated herein by reference.

7.      As set forth in the Complaint, the FBI and the New York City Department

of Investigation ("DOI") have been conducting an investigation into allegations of fraudulent

billing practices in connection with the New York State Early Intervention Program (the "EIP"),

a program that provides remedial services to developmentally delayed children from birth to age

three.  Such services may include physical, occupational, and speech therapy; special instruction;

and social work services.  These services are provided by individual therapists who are either

subcontractors or employees of agencies that hold EIP contracts with the New York State

Department of Health ("NYS DOH").  The New York City Department of Health and Mental

Hygiene ("NYC DOHMH") administers the EIP in New York City and conducts audit, quality

assurance, and compliance oversight of the EIP, under the ultimate oversight of NYS DOH.

8.      In order to receive payment for an EIP therapy session, a therapist must

provide a written report, known as a session note, documenting his or her session with a child.

Sessions generally occur in half-hour or one-hour increments.  These session notes detail the

date, time and place of the session as well as some details of the therapy given and the child's

progress in response to the treatment.  Session notes must be signed by the therapist and the parent or guardian of the child immediately after the EIP therapy session ends.

9.      As set forth in the Complaint, the investigation revealed that in or about and between January 1, 2015 and June 30, 2019, the Defendants, all EIP therapists, submitted thousands of fraudulent session notes and accompanying invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.

10.      On October 26, 2021, agents from the FBI and DOI arrested all nine Defendants identified in the complaint and seized the SUBJECT DEVICES from seven of the Defendants during or following those arrests.  Agents seized the SUBJECT DEVICES from the respective Defendants listed and shown in the top two pictures in paragraph 4 above.

11.      In addition, following her arrest, Margaret Dominique-Mclain provided the following two cellular telephones to the FBI through her retained counsel, Jonathan Rosenberg.  Those two phones are shown in the bottom two pictures in paragraph 4 above.

12.      The SUBJECT DEVICES are currently within the possession of the FBI within the Eastern District of New York.  Based upon my training and experience, I know that the SUBJECT DEVICES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICES first came into the possession of the FBI.

13.      Based on the facts set forth herein, as well as my training, experience and participation in the investigation, there is probable cause to believe there is information stored on the SUBJECT DEVICES concerning the SUBJECT OFFENSES.

14.      As noted in the Complaint, the FBI previously arrested eight EIP therapists for similar crimes in October 2018.  See No. 18-MJ-927.  In that investigation, the

Honorable Vera M. Scanlon, United States Magistrate Judge, signed a warrant for eight cellular phones seized in connection with those arrests.  See No. 18-MJ-1009.  The searches of those phones uncovered powerful evidence of those defendants' crimes, including photographs showing the defendants in locations other than in New York City providing services during the times of claimed EIP sessions; text messages discussing those defendants' current and planned locations, which demonstrated that they were not providing EIP sessions as reported; calendar entries showing the defendants' plans to be elsewhere during billed sessions; and browsing history showing that the defendants were not providing EIP sessions at time reported.  For example, one defendant's photos and metadata showed the defendant hiking in upstate New York during times that the defendant was purportedly providing therapy services in New York City.  Another "selfie" photo, metadata and calendar entry showed a defendant at a Broadway show during a time that defendant was purportedly providing therapy services.

15.     Based on the facts here, there is probable cause to believe that the SUBJECT DEVICES will similarly contain evidence of the Defendants' fraud.  For example, as described in the Complaint, law enforcement officers identified the Defendants' cellular telephone numbers based on EIP employment records, and compared historical location data or toll records for the SUBJECT DEVICES to location information contained in the EIP session notes submitted by the Defendants.  On thousands of occasions, the Defendants submitted session notes and accompanying invoices for EIP sessions that purportedly occurred at times when the Defendants were not present in the vicinity of the EIP therapy session location.  Based on these facts, as well as my training, experience and participation in the investigation, I submit that there is probable cause to believe that the SUBJECT DEVICES will contain location data showing that the Defendants were not present for EIP sessions they claimed to perform.

16.     Agents also reviewed travel records for certain Defendants and observed that, in hundreds of cases, those Defendants submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when they were outside of New York state, outside of the United States, or in transit.  Based on these facts, as well as my training, experience and participation in the investigation, I submit that there is probable cause to believe that the SUBJECT DEVICES will contain records of the Defendants' travel during these sessions, including travel documents, itineraries receipts and photographs.

17.     Agents also reviewed toll records for the telephone numbers associated with the Defendants, and observed that in hundreds of cases, the Defendants were using the SUBJECT DEVICES during a significant portion of the time period that they claimed to be performing EIP therapy sessions.  According to NYC DOHMH officials, EIP therapists cannot treat a child while using a telephone, because EIP therapists must monitor, interact with, and take notes about the child throughout the entire session.  Based on these facts, as well as my training, experience and participation in the investigation, I submit that there is probable cause to believe that the SUBJECT DEVICES will contain evidence of the Defendants' activities during these occasions, including call records, text messages and browsing history.

18.     Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom the Defendants claimed to provide EIP therapy sessions.  These caretakers informed law enforcement that they were frequently in contact with the Defendants via cellular telephone, either by phone calls or by text messages.  Based on these facts, as well as my training, experience and participation in the investigation, I submit that there is probable cause to believe that the SUBJECT DEVICES will contain evidence of

communication between the Defendants and the caretakers of children to whom the Defendants claimed to provide EIP therapy sessions regarding the scheduling of such sessions.

## BIOMETRIC UNLOCKING OF THE SUBJECT DEVICES

19.     The warrant I am applying for would permit law enforcement to obtain from Defendants Adolphe, Dominique-Mclain, Gibson, Moore and Paolicelli the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock those Defendant's SUBJECT DEVICES.  I believe that law enforcement already has the passcodes for the SUBJECT DEVICES used by Falcon, Johnson and Ogundiran, but this application seeks permission to obtain their biometric characteristics in an abundance of caution if those passcodes do not work.  I seek this authority based on the following:

20.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

21.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint

sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

22.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face.  The device's camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

23.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

24.     As set forth in paragraph 19 above, the passcode or password that would unlock each of the SUBJECT DEVICES used by Defendants Adolphe, Dominique-Mclain, Gibson, Moore and Paolicelli and subject to search under this warrant is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within those SUBJECT DEVICES, making the use of biometric features necessary to the execution of the search authorized by this warrant.

25.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that

biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Face ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using facial recognition for 4 hours *and* the passcode or password has not been entered in the last 156 hours.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

26.     Due to the foregoing, if the SUBJECT DEVICES may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the relevant Defendant's fingers (including thumbs) to the fingerprint scanner of the device; (2) hold the device in front of the relevant Defendant's face and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.  To the extent this is necessary, the government will promptly seek to arrange this through counsel.

**TECHNICAL TERMS**

27.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the

12

ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet,

13

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the SUBJECT DEVICES have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

30.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICES were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICES because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

14

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31.      *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICES consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the SUBJECT DEVICES to human inspection in order to determine whether it is evidence described by the warrant.

15

32.  *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

33.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Angel Agesta
Special Agent
Federal Bureau of Investigation

Sworn to before me by telephone
on October 27, 2021:

HONORABLE CHERYL L. POLLAK
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

16

## ATTACHMENT A

The property to be searched is listed and depicted below:

- ONE APPLE IPHONE IN A BLUE CASE USED BY MARSISTE ADOLPHE;

- ONE ROSE GOLD APPLE IPHONE IN A CLEAR CASE USED BY MARGARET DOMINIQUE-MCLAIN;

- ONE APPLE IPHONE IN A GEMSTONE CASE USED BY MARGARET DOMINIQUE-MCLAIN;

- ONE SILVER APPLE IPHONE USED BY MERCEDES FALCON;

- ONE BLACK  APPLE IPHONE USED BY TRACY GIBSON;

- ONE ROSE GOLD APPLE IPHONE USED BY ROSELEE JOHNSON;

- ONE APPLE IPHONE IN A BLACK RUBBER CASE USED BY MANUEL MOORE;

- ONE APPLE IPHONE IN A PURPLE GEMSTONE CASE USED BY KIKELOMO OGUNDIRAN; AND

- ONE BLACK APPLE IPHONE IN A CLEAR CASE USED BY DINO PAOLICELLI,

(the "SUBJECT DEVICES").  The SUBJECT DEVICES are depicted below; the two belonging

to Dominique-Mclain are shown below the others, which are labeled with the relevant

Defendant's name.







This warrant authorizes the forensic examination of the SUBJECT DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

2

**ATTACHMENT B**

1.      All records on the SUBJECT DEVICES described in Attachment A that
relate to commission of violations of Title 18, United States Code, Sections 666(a)(l)(A) and
1347 and involve MARSISTE ADOLPHE, MARGARET DOMINIQUE-MCLAIN,
MERCEDES FALCON, TRACY GIBSON, ROSELEE JOHNSON, JEANNETTE
MONCLOVA, MANUEL MOORE, KIKELOMO OGUNDIRAN, and DINO PAOLICELLI
(the "Defendants") from the period January 1, 2015 and June 30, 2019, including:

a.      names and telephone numbers, as well as the contents of all call
logs, contact lists, text messages (including iMessages and messages contained in messaging
applications), emails (including those sent, received, deleted and drafted), instant messages,
photographs, videos, social media posts and/or messages, Internet activity (including browser
history, web page logs, and search terms entered by the user), geo-location data, application data,
calendar entries and other electronic media;

b.      evidence of user attribution showing who used or owned the
Device at the time the things described in this warrant were created, edited, or deleted, such as,
for example, logs, phonebooks, saved usernames and passwords, documents, and browsing
history;

c.      evidence of software that would allow others to control the Device,
such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the
presence or absence of security software designed to detect malicious software;

d.      evidence of the times the Devices were used;

e.      passwords, encryption keys, and other access devices that may be
necessary to access the Devices; and

      f.     contextual information necessary to understand the evidence described in this Attachment,

all of which constitute evidence of violations of Title 18, United States Code, Sections 666(a)(l)(A) and 1347.

      2.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

      3.     This warrant also authorizes law enforcement executing this warrant to obtain from the Defendants the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock the SUBJECT DEVICES.  Specifically, if it is determined that any of the SUBJECT DEVICES can be unlocked with a biometric feature, law enforcement agents will be authorized to (i) press the fingers (including thumbs) of the Defendants; and (ii) hold the Defendants in place while holding the SUBJECT DEVICES in front of their faces to activate the facial recognition feature, for the purpose of attempting to unlock the device via those features in order to search the contents as authorized by this warrant. To the extent this is necessary, the government will promptly seek to arrange this through counsel.

# **ATTACHMENT C**

RCH:KTF/JS
F. #2019R01072

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -

MARSISTE ADOLPHE,
MARGARET DOMINIQUE-MCLAIN,
MERCEDES FALCON,
TRACY GIBSON,
ROSELEE JOHNSON,
JEANNETTE MONCLOVA,
MANUEL MOORE,
KIKELOMO OGUNDIRAN, and
DINO PAOLICELLI,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

AFFIDAVIT AND COMPLAINT IN
SUPPORT OF APPLICATION
FOR ARREST WARRANTS

(18 U.S.C. §§ 666(a)(1)(A) and 1347(a))

21-MJ-1205

EASTERN DISTRICT OF NEW YORK, SS:

       ANGEL AGESTA, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as

such.

       In or about and between January 1, 2015 and June 30, 2019, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants MARSISTE ADOLPHE ("ADOLPHE"), MARGARET DOMINIQUE-MCLAIN

("DOMINIQUE-MCLAIN"), MERCEDES FALCON ("FALCON"), TRACY GIBSON

("GIBSON"), ROSELEE JOHNSON ("JOHNSON"), JEANNETTE MONCLOVA

("MONCLOVA"), MANUEL MOORE ("MOORE"), KIKELOMO OGUNDIRAN

2

("OGUNDIRAN"), and DINO PAOLICELLI ("PAOLICELLI"), (collectively, "the defendants"): (i) being agents of an agency of a local government, to wit: the New York City Department of Health and Mental Hygiene (the "NYC DOHMH"), did knowingly and intentionally embezzle, steal, obtain by fraud, or otherwise without authority knowingly convert to the use of a person other than the rightful owner, property that is valued at $5,000 or more and is owned by, or is under the care, custody, or control of the NYC DOHMH, an organization that received benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance in one or more one-year periods; and (ii) did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, to wit: Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by and under the custody and control of said health care benefit program in connection with the delivery of and payment for health care benefits and services.

(Title 18, United States Code, Section 666(a)(1)(A) and 1347(a))

The source of your deponent's information and the grounds for her belief are as follows:[1]

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for over three years.  During my tenure with the FBI, I have participated in investigations involving, among other things, fraud and financial crimes.  I have also

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

conducted interviews, made arrests, executed search warrants, and secured other relevant information using a variety of investigative techniques.  I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; my communication with witnesses and other law enforcement officers; my review of reports of other law enforcement officers involved in the investigation; and my review of other records associated with the investigation.

2.     The FBI and the New York City Department of Investigation ("DOI") have been conducting an investigation into allegations of fraudulent billing practices in connection with the New York State Early Intervention Program (the "EIP").  The EIP is a New York State program that provides remedial services to developmentally delayed children from birth to age three.  Such services may include physical, occupational, and speech therapy; special instruction; and social work services.  These services are provided by individual therapists who are either subcontractors or employees of agencies that hold EIP contracts with the New York State Department of Health ("NYS DOH").  NYC DOHMH administers the EIP in New York City and conducts audit, quality assurance, and compliance oversight of the EIP, under the ultimate oversight of NYS DOH.

3.     In order to receive payment for an EIP therapy session, a therapist must provide a written report, known as a session note, documenting his or her session with a child. Sessions generally occur in half-hour or one-hour increments.   These session notes detail the date, time and place of the session as well as some details of the therapy given and the child's progress in response to the treatment.   Session notes must be signed by the therapist and the parent or guardian of the child immediately after the EIP therapy session ends.

4.      EIP therapists based in New York City are paid for their services through EIP agencies which are, in turn, reimbursed by either: (i) Medicaid; (ii) the NYC DOHMH (through an escrow account managed by New York State); or (iii) private insurance companies. Between 2015 and 2019, NYC DOHMH received at least $10,000 in federal funds each calendar year.[2]

5.      Fraudulently billing for EIP sessions that do not occur harms more than only the local, state and federal authorities, or private insurers, who pay for EIP.   Each child eligible for EIP is prescribed a certain amount of EIP sessions, and EIP therapists can only bill for prescribed EIP sessions.   Any falsely billed session is therefore a necessarily prescribed session that the eligible child was entitled to but did not receive.

6.      As set forth below, the investigation to date has revealed that the defendants, all EIP therapists, submitted numerous fraudulent EIP session notes and accompanying invoices for non-existent EIP sessions that purportedly occurred in the Eastern District of New York and elsewhere.

I.      The NYC DOHMH Analysis

7.      On October 4, 2018, the Federal Bureau of Investigations arrested eight EIP therapists for falsely claiming to have provided services that they, in fact, did not provide. See 18-MJ-927 (the "October 2018 Arrests").   In June 2019, NYC DOHMH began a

---

[2] The vast majority of reimbursements for EIP therapists do not come from private insurance companies, but instead come from either Medicaid or the NYC DOHMH. For example, in 2017, less than two percent of the total reimbursements for EIP therapists came from private insurance companies.

follow-up investigation into additional, unusually high-billing EIP therapists, including the defendants.

8.     NYC DOHMH analyzed EIP session records to identify suspicious patterns.  Among other patterns, NYC DOHMH examined relevant records to locate any of the following indicators that an EIP therapist may have been falsely claiming to have conducted EIP sessions that did not occur:

   a.  *Early-morning or late-night EIP sessions*.  Because all EIP sessions were conducted with children between the ages of birth and three years old, a high number of EIP sessions occurring before 7:00 a.m. or after 9:00 p.m. (when most children of such ages are asleep) was a possible indication of fraudulent billing.

   b.  *Multiple visits to a single location on the same day.*  EIP sessions were normally conducted in the child's home or at a daycare location.  As a result, EIP therapists often had to travel between locations to provide services to different children.  Travel time, however, is not billable, and EIP therapists therefore have every incentive to consolidate all EIP sessions at a given location into one visit.  Thus, billing records indicating that an EIP therapist made multiple separate visits to the same location in a single day were a possible indication of fraudulent billing.

   c.  *Insufficient travel time.*  As previously stated, EIP therapists had to travel between service locations, such as homes or daycare locations, and such travel time was not billable.  In addition, even after an EIP provider arrived at a location, time spent speaking to parents, signing into daycare locations or setting up for EIP sessions was not billable.  Thus, it may not have been plausible for an EIP therapist to finish an EIP session at one location, travel to another location and begin a new EIP session within 15 minutes or less.  Billing for EIP sessions at different locations that begin within less than 15 minutes of each other was therefore a possible indication of fraudulent billing.

   d.  *Unrealistic number of days worked in a year or unrealistic number of hours worked per day, week or year.*  Records indicating that a therapist claimed to have worked an unrealistic number of days or hours was also a possible indication of fraudulent billing.

II.   MARSISTE ADOLPHE

9.   Between approximately February 2015 and May 2019, MARSISTE ADOLPHE, an EIP therapist, submitted fraudulent session notes and invoices.   In return, ADOLPHE received payment for at least 2,860 non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere, resulting in the improper disbursement of more than $295,305.00, including more than $110,565 in Medicaid funds and more than $94,217 in NYC DOHMH funds.

A.   Evidence from the NYC DOHMH Analysis

10.   The NYC DOHMH performed a preliminary analysis of ADOLPHE's billing records for the period February 23, 2015 to July 31, 2018.   During the period February 23, 2015 to July 31, 2018, ADOLPHE purportedly had an EIP session with an infant or toddler beginning before 7:00 a.m. for 77% of the days that he claimed to have worked.   He purportedly had an EIP session ending after 9:00 p.m. on 81% of the days he claimed to have worked, and he often purportedly had multiple EIP sessions ending after 9:00 p.m. on a given day — sometimes purportedly ending as late as 11:45 p.m.

11.   In at least 60 instances, ADOLPHE claimed to have conducted a late-night EIP session with an infant or toddler, which was allegedly followed by an early-morning EIP session the next morning with the same infant or toddler.   In at least 35 instances, ADOLPHE claimed to have conducted a late-night EIP session with an infant or toddler, allegedly followed by an early-morning EIP session the next day with the same infant or toddler, allegedly followed by yet another late-night EIP session with the same toddler that night.   Similarly, on more than half the days ADOLPHE purportedly worked, he claimed to have made multiple visits to the same home two or more times in a single day.

12.     On 84% of the days ADOLPHE claimed to have worked, he had at least three instances per day of claiming to have traveled less than 15 minutes between EIP sessions at different locations across New York City.

13.     ADOLPHE also claimed to have worked an unrealistic number of days per year and an unrealistic number of hours per day, week and year.   By way of comparison, a five-day work week with no holidays, vacations or sick days would amount to working 71% of days in the year.   In the period examined, ADOLPHE claimed to have worked 93% of all possible days, which averages less than one day off every two weeks for approximately three-and-a-half years.   ADOLPHE claimed to have worked every day in 2016, including Christmas and Thanksgiving, and to have worked all but 14 days in 2017.

14.     In 2016, ADOLPHE claimed to have performed 5,299 hours in EIP sessions in a single year, an average of over 14 hours per day across the year, including weekends and holidays.   Between January and July 2018 (approximately half a year), he claimed to have performed at least 2,018 hours in EIP sessions.   This does not include time for travel, set-up or breaks, none of which are billable.

15.     ADOLPHE claimed to have provided 51 hours or more of direct service every week for at least 98 weeks in a row between September 2015 and September 2017. From January to July 2018, he claimed to have worked 28 weeks with over 51 hours in EIP sessions per week.

16.     On 72% of days that ADOLPHE claimed to have worked, he billed for ten hours or more in EIP sessions per day.   In 2016, he claimed to have worked more than ten hours per day on 358 out of 366 days that year.

17.     Following the October 2018 Arrests, the NYC DOHMH conducted a follow-up analysis of the billing patterns of the defendants to see if they had changed after the arrests and the related press attention.   This analysis showed that subsequent to the October 2018 Arrests, ADOLPHE's billing practices changed.

18.     In the three months following the October 2018 Arrests, the average hours in EIP sessions per day submitted by ADOLPHE dropped by approximately half.   By April 2019, however, his average number of EIP sessions purportedly conducted per day had returned to approximately its previous level.

19.     Similarly, ADOLPHE's number of days with ten hours or more in EIP sessions dropped to zero in the month after the October 2018 Arrests, remained below 20% for the next two months, but returned to above 70% in April 2019.   His days per month with EIP sessions ending after 9:00 p.m. dropped from 87% in the month before the October 2018 Arrests to 0% for the following three months — but rose to 54% in April 2019.

B.     Additional Evidence

20.     Law enforcement agents obtained historical location data [3] for ADOLPHE's cellular telephone, which was identified as ADOLPHE's cellular telephone based on, among other things, EIP employment records.   Law enforcement officers compared the historical location data associated with ADOLPHE's telephone to location information

_____

[3]   In each instance herein where reference is made to historical location data that law enforcement agents obtained for cellular telephones, the data was obtained via a judicially authorized search warrant.   Based on my training and experience, I know that historical cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from a given cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected at a given point in time. Historical cell-site data thus can establish the general geographic location of a cellular telephone at a given point in time.

contained in the EIP session notes submitted by ADOLPHE.   Based on this review, agents determined that on more than 800 occasions, ADOLPHE was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

21.    Law enforcement officers also reviewed telephone toll records for ADOLPHE's cellular telephone and determined that on at least 84 occasions, ADOLPHE was using his cellular telephone during at least a quarter of the time period that he claimed to be performing a one-hour EIP therapy session.   According to NYC DOHMH officials, EIP therapists cannot treat a child while using a telephone, because EIP therapists must monitor, interact with, and take notes about the child throughout the entire session.

22.    Law enforcement officers also interviewed the parents of children to whom ADOLPHE claimed to provide EIP therapy sessions.   During the interviews, the parents described the days of the week and hours of the day that ADOLPHE provided EIP services to their children.   Law enforcement officers compared the parents' statements to the hours of service that ADOLPHE billed for the children at issue and identified at least 1,500 occasions where ADOLPHE billed for EIP sessions on days and/or times which the parents stated that EIP sessions did not occur.   For example, one parent of two children to whom ADOLPHE provided EIP services told law enforcement officers that ADOLPHE's EIP sessions ended at 8:00 p.m. because that was the children's bedtime.   However, ADOPLHE billed for more than 1,100 EIP sessions with these children that begin at 7:30 p.m. or later and end at 8:30 p.m. or later.

23.    Law enforcement officers also reviewed ADOLPHE's travel records and determined that, on at least 500 occasions, ADOLPHE submitted fraudulent EIP invoices for

therapy sessions that purportedly occurred when ADOLPHE was either outside of New York State or in transit.

III.   MARGARET DOMINIQUE-MCLAIN

24.   Between approximately January 2016 and April 2019, MARGARET DOMINIQUE-MCLAIN, an EIP therapist, submitted fraudulent session notes and invoices and received payment for at least 2,137 non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   These false claims resulted in the improper disbursement of more than $221,790, including more than $46,965 in Medicaid funds and more than $89,160 in NYC DOHMH funds.

A.   Evidence from the NYC DOHMH Analysis

25.   The NYC DOHMH performed a preliminary analysis of DOMINIQUE-MCLAIN's billing records for the period January 1, 2016 to December 31, 2018.  Each of the years analyzed showed a significant number of days with EIP sessions purportedly occurring before 7:00 a.m. and after 9:00 p.m.   In 2018, DOMINIQUE-MCLAIN reported early-morning EIP sessions on 35% of working days and late-night EIP sessions on at least 29% of working days.   The rates were high in all years examined, but peaked in 2018.

26.   DOMINIQUE-MCLAIN further claimed an unrealistically high level of work, with 51 or more hours of claimed EIP sessions in 99 out of 156 weeks examined.

27.   DOMINIQUE-MCLAIN billed for at least 402 days (out of 917 she claimed to have worked) with between 11 and 14 hours in EIP sessions per day. DOMINIQUE-MCLAIN billed for an additional 87 days with 10 hours of work.

28.   In 2018, DOMINIQUE-MCLAIN claimed that in 40 out of 52 weeks (72%), she provided 51 or more hours in EIP sessions.   She also claimed that she provided

ten hours or more in EIP sessions per day on at least 180 days (85% of all days she claimed to have worked), including 98 12-hour days, 10 13-hour days and 55 14-hour days.

29.     The NYC DOHMH called the families of two children previously served by DOMINIQUE-MCLAIN.   One parent reported that her child received EIP sessions at daycare, which opened at 7:30 a.m.   But DOMINIQUE-MCLAIN reported 122 EIP sessions with this child delivered prior to 7:30 a.m.   The parent further reported that DOMINIQUE-MCLAIN came to the home on six occasions, each time with a large stack of session notes for the parent to sign.   The parent stated that she signed months' worth of notes on these occasions.[4]

30.     Another parent reported that DOMINIQUE-MCLAIN never came on Sundays or after 7:00 p.m. at night.   But DOMINIQUE-MCLAIN claimed to have provided 308 EIP sessions after 7:00 p.m., including at least one EIP session going as late as 10:23 p.m., and EIP sessions on 31 different Sundays.

31.     The   NYC   DOHMH's   follow-up   analysis   showed   that DOMINIQUE-MCLAIN's behavior temporarily changed after the October 2018 Arrests.   In the eight months prior to the arrests, DOMINIQUE-MCLAIN claimed late-night EIP sessions on 39% of days she claimed to have worked, culminating with 78% of days reportedly worked in the month before the arrests.   The month after the arrest, the percentage dropped to 4%. The percentage remained at 10% or below for several months, but went back up to 35% in April 2019.

---

[4]     Under the EIP's rules, sessions notes must be signed at the time of a session and may not be filled out in bulk.

32.     Similarly, in the eight months before the October 2018 arrests, DOMINIQUE-MCLAIN averaged 68 hours in EIP sessions per week.   In the eight months after the arrests, she averaged 38 hours in EIP sessions per week, a 44% decrease.

33.     In the eight months before the arrests, DOMINIQUE-MCLAIN claimed to conduct 10 or more hours in EIP sessions per day on 81% of days she purportedly worked. In the eight months after the arrests, the percentage dropped to 31%, a 62% decrease.

B.    Additional Evidence

34.     Law enforcement agents obtained historical location data for DOMINIQUE-MCLAIN's cellular telephone, which was identified as DOMINIQUE-MCLAIN's cellular telephone based on, among other things, EIP employment records.   Law enforcement officers compared the historical location data associated with DOMINIQUE-MCLAIN's telephone to location information contained in the EIP session notes submitted by DOMINIQUE-MCLAIN.   Based on this review, agents determined that on more than 1,900 occasions, DOMINIQUE-MCLAIN was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

35.     Law enforcement officers also reviewed telephone toll records for DOMINIQUE-MCLAIN's cellular telephone and determined that on at least 248 occasions, DOMINIQUE-MCLAIN was using her cellular telephone during at least a quarter of the time period that she claimed to be performing a one-hour EIP therapy session.

36.     Law enforcement officers also obtained license plate recognition ("LPR") records for vehicles registered to DOMINIQUE-MCLAIN.   Law enforcement officers compared LPR records to the EIP invoices submitted by DOMINQUE-MCLAIN and determined that on at least 46 occasions DOMINIQUE-MCLAIN submitted an invoice for an

EIP therapy session when LPR records reflected that her vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

37.     Law enforcement officers also reviewed DOMINIQUE-MCLAIN's travel records and determined that, on at least 16 occasions, DOMINIQUE-MCLAIN submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when DOMINIQUE-MCLAIN was, in fact, either outside of New York or in transit.

IV.   MERCEDES FALCON

38.     During the course of this investigation, law enforcement officers determined that MERCEDES FALCON, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   Specifically, law enforcement officers determined that, between approximately January 2016 and December 2018, FALCON submitted fraudulent session notes and invoices and received payment for at least 6,384 non-existent EIP sessions, resulting in the improper disbursement of more than $636,345, including more than $291,225 in Medicaid funds and more than $176,011 in NYC DOHMH funds.

A.     Evidence from the NYC DOHMH Analysis

39.     The NYC DOHMH performed a preliminary analysis of FALCON's billing records for the period January 1, 2016 to December 31, 2018.   In that period, FALCON billed for at least 592 EIP sessions that purportedly ended after 9:00 p.m. (sometimes as late as 3:00 a.m.) and at least 403 EIP sessions beginning before 7:00 a.m. (sometimes as early as 4:00 a.m.).

40.     During that period, FALCON claimed to have worked 92% of all possible days.   In 2018, FALCON also claimed to conduct 51 or more hours in EIP sessions

in 45 out of 52 weeks (87%), with seven weeks in which she billed for 81 hours or more in EIP sessions for the week.   FALCON also claimed to perform more than 12 hours in EIP sessions per day for 93 days in 2018.

41.     For example, on March 22, 2018, FALCON claimed to work from 6:00 a.m. to 11:00 p.m. (a 17-hour day).   During this time, FALCON claimed to service nine different children.   For eight out of ten of the travel times between EIP sessions, FALCON claimed to have made the trip and set up for the new EIP session in 15 minutes or less.   On the following day, FALCON claimed to have resumed EIP sessions at 6:00 a.m. and to have performed 12.5 hours of EIP sessions.

42.     NYC DOHMH called the parents of three children previously served by FALCON.   One parent stated that EIP sessions were never provided after 7:00 p.m. and that her child was asleep by 9:00 p.m.   Yet FALCON billed for EIP sessions with this child starting after 7:00 p.m., claiming that some EIP sessions ended as late as 10:42 p.m.

43.     Another parent stated that FALCON had typically arrived at 5:30 pm. or 6:00 p.m. and that there were only one or two occasion where FALCON had finished EIP sessions at 8:00 p.m. or later.   In contrast, a majority of EIP sessions billed by FALCON for this child purportedly began after 8:00 p.m.

44.     The NYC DOHMH's follow-up analysis showed that FALCON's billing patterns changed dramatically after the October 2018 Arrests.   Comparing the eight months before the arrests to the eight months after the arrests:

- FALCON's percentage of days with claimed EIP sessions after 9:00 p.m. dropped from 54% to 30%;

- FALCON's percentage of days purportedly worked dropped from 96% to 77%;

- FALCON's average hours purportedly worked per day dropped from 9.9 to 7.6;

- FALCON's average hours reportedly worked per week dropped from 66.5 to 40.7;

- FALCON's percentage of days with ten or more EIP sessions claimed per day dropped from 62% to approximately 32%; and

- FALCON's percentage of weeks with 51 hours or more of reported EIP sessions per week dropped from 91% to 39%.

45.    In addition, FALCON's percentage of days with claimed early-morning EIP sessions dropped from 84% the month before the arrests to 38% the month after the arrest. By February, March and April 2019, it had dropped to 0%.

B.    Additional Evidence

46.    Law enforcement agents obtained historical location data for FALCON's cellular telephone, which was identified as FALCON's cellular telephone based on, among other things, EIP employment records.   Law enforcement officers compared the historical location data associated with FALCON's telephone to location information contained in the EIP session notes submitted by FALCON.   Based on this review, agents determined that on more than 6,100 occasions, FALCON was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

47.    Law enforcement officers reviewed telephone toll records for FALCON's cellular telephone, which they identified as FALCON's cellular telephone based on, among other things, EIP employment records, and determined that on at least 473 occasions

FALCON was using her cellular telephone during at least a quarter of the time period that she claimed to be performing a one-hour EIP therapy session.

V.     TRACY GIBSON

48.     During the course of this investigation, law enforcement officers determined that TRACY GIBSON, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   Specifically, law enforcement officers determined that, between approximately January 2015 and April 2019, GIBSON submitted fraudulent session notes and invoices and received payment for at least 1,086 non-existent EIP sessions, resulting in the improper disbursement of more than $111,420, including at least $19,170 in Medicaid funds and more than $47,047 in NYC DOHMH funds.

A.     Evidence from the NYC DOHMH Analysis

49.     The NYC DOHMH performed a preliminary analysis of GIBSON's billing records for the period January 1, 2015 to July 31, 2018.   In 2015 and 2016, GIBSON had a combined total of five days where she made multiple visits to the same location in a single day.   In 2017, however, she claimed to have made such repeated visits on 63 days. And between January and July 2018, she claimed to have made such repeat visits on 70 days.

50.     In 2018, there were dozens of days where GIBSON purportedly had an early-morning EIP session (e.g., 6:45 to 8:45 a.m.) and then three late-night EIP sessions (e.g., 8:30 to 11:30 p.m.) on the same day, with the same child and at the same location.   As discussed above, because travel time is not billable, EIP therapists have every economic incentive to avoid multiple trips to the same location in a single day.

51.     Between January 1, 2017 and July 31, 2018, GIBSON claimed to have worked 551 days out of 577, which represents 95% of all possible days.   Between April 2, 2017 and July 31, 2018, GIBSON claimed to have worked every single day.

52.     Between January 1, 2017 and July 31, 2018, GIBSON purportedly conducted 51 or more hours of EIP sessions per week for 55 out of 82 weeks.   During that period, GIBSON claimed to have provided more than ten hours of EIP sessions per day on approximately 41% of days she purportedly worked.

53.     Among parents contacted by the NYC DOHMH, several contradicted GIBSON's billing records, for example stating that late-night EIP sessions happened only "once in a blue moon" even though GIBSON claimed a significant number of late-night EIP sessions.

54.     The NYC DOHMH's follow-up analysis showed that GIBSON's billing patterns initially changed after the October 2018 Arrests but soon returned to suspicious patterns.

55.     In the eight months submitted before the arrests, GIBSON claimed to have worked every single day.   In the month after the arrests, however, GIBSON claimed to have worked only 20% of days, and in the following month, GIBSON claimed to have only worked 10% of days.   But by March 2019, GIBSON was claiming to have worked 94% of all possible days, and by April 2019, GIBSON was again claiming to have worked at least 90% of all days.

56.     In the eight months before the October 2018 arrests, GIBSON claimed to have performed ten hours or more in EIP sessions per day on 41% of days.   In the two

months after the arrest, this percentage dropped to 0%.   It then rose to between 59% and 70% for several months before declining to 27% by April 2019.

57.     In the eight months before the October 2018 Arrests, GIBSON claimed to have early-morning EIP sessions on 19% of days.   In the eight months after the arrests, her percentage of such EIP sessions dropped to 0%.

B.     Additional Evidence

58.     Law enforcement agents obtained historical location data for GIBSON's cellular telephone, which was identified as GIBSON's cellular telephone based on, among other things, EIP employment records.   Law enforcement officers compared the historical location data associated with GIBSON's telephone to location information contained in the EIP session notes submitted by GIBSON.   Based on this review, agents determined that on more than 800 occasions, GIBSON was not present in the vicinity of the EIP therapy session location at the time that the EIP session purportedly occurred.

59.     Law enforcement officers reviewed toll records for GIBSON's cellular telephone and determined that on at least 76 occasions GIBSON was using her cellular telephone during at least a quarter of the time period that she claimed to be performing a one-hour EIP therapy session.

60.     Law enforcement officers also reviewed GIBSON's travel records and determined that, on at least 25 occasions, GIBSON submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when GIBSON was, in fact, either outside of New York or in air transit.

VI.   ROSELEE JOHNSON

61.   During the course of this investigation, law enforcement officers determined that ROSELEE JOHNSON, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   Between approximately January 2015 and May 2019, JOHNSON submitted fraudulent session notes and invoices and received payment for more than 5,340 non-existent EIP sessions, resulting in the improper disbursement of more than $540,000, including more than $156,000 in Medicaid funds and more than $389,000 in NYC DOHMH funds.

A.   Evidence from the NYC DOHMH Analysis

62.   The NYC DOHMH performed a preliminary analysis of JOHNSON's billing records for the period January 1, 2015 to November 15, 2018.   During that period, JOHNSON claimed to have an early-morning EIP session (sometimes starting as early as 4:45 a.m.) on at least 9% of days she claimed to work.   She also claimed to have late-night EIP sessions (sometimes ending as late as 11:40 p.m.) on 39% of days she claimed to work, sometimes with multiple late-night EIP sessions on the same day.   This rate decreased slightly in 2017 but returned to unusually high levels in 2018.

63.   Between January 1, 2015 and December 31, 2017, JOHNSON claimed to work 93% of all possible days.   This averaged to approximately two days off a month for 36 continuous months.

64.   The NYC DOHMH called the families of nine children currently and previously served by JOHNSON.   Several of these parents reported that JOHNSON did not stay for the full number of hours or that she did not provide the services as claimed.   One

parent stated that JOHNSON had provided services between two and five occasions, but JOHNSON had submitted bills for 18 EIP sessions on 18 different days.  Another parent stated that JOHNSON never stayed for a full two hours.  JOHNSON, however, submitted billing records for 51 EIP sessions with this parent's child, each of which billed for a full two hours.

65.     Another parent stated that JOHNSON never provided EIP sessions on weekends, but JOHNSON submitted claims for eight Saturday EIP sessions for this child between June 2018 and October 2018.  In a follow-up analysis, NYC DOHMH found JOHNSON claimed to meet with this child an additional 19 times between October 2018 and March 2019 — all on weekends.

66.     Another set of parents reported that JOHNSON always came for EIP sessions in the evenings.  But JOHNSON billed for EIP sessions beginning at 10:30 a.m. or earlier over 70 times.   In 59 of these cases, the EIP session purportedly began at 6:00 a.m. or 6:45 a.m.

67.     The NYC DOHMH's follow-up analysis showed that all of JOHNSON's early-morning EIP sessions stopped after the October 2018 Arrests.   Specifically, in the eight months before the arrests, JOHNSON had claimed to have early-morning EIP sessions on 30% of days worked, but in the months after the arrests, the percentage dropped to 0%.

B.     Additional Evidence

68.     Law enforcement agents obtained historical location data for JOHNSON's cellular telephone, which was identified as JOHNSON's cellular telephone based on, among other things, EIP employment records.  Law enforcement officers compared the historical location data associated with JOHNSON's telephone to location information

contained in the EIP session notes submitted by JOHNSON.  Based on this review, agents determined that on more than 4,850 occasions, JOHNSON was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

69.     Law enforcement officers reviewed toll records for JOHNSON's cellular telephone, which they identified as JOHNSON's cellular telephone based on, among other things, EIP employment records, and determined that on at least 560 occasions JOHNSON was using her cellular telephone during at least a quarter of the time period that she claimed to be performing a one-hour EIP therapy session.

70.     Law enforcement officers reviewed JOHNSON's bank account records and determined that, on more than 495 occasions, JOHNSON billed for an EIP therapy session on days when her bank records indicated she was making purchases outside of New York State.

71.     Law enforcement officers also obtained LPR records for a vehicle registered to JOHNSON.  Law enforcement officers compared LPR records to the EIP invoices submitted by JOHNSON and determined that on at least 195 occasions JOHNSON submitted an invoice for an EIP therapy session when LPR records reflected that his vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

VII.     <u>JEANNETTE MONCLOVA</u>

72.     During the course of this investigation, law enforcement officers determined that JEANNETTE MONCLOVA, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.  Between approximately January 2015 and June 2019, JEANNETTE MONCLOVA, an EIP therapist, submitted fraudulent session notes

and invoices and received payment for more than 2,400 non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   These false claims resulted in the improper disbursement of more than $251,000, including more than $57,000 in Medicaid funds and more than $194,000 in NYC DOHMH funds.

A.   Evidence from the NYC DOHMH Analysis

73.   The NYC DOHMH performed a preliminary analysis of MONCLOVA's billing records for the period January 1, 2015 to July 31, 2018.   During that period, MONCLOVA frequently claimed to conduct EIP sessions very late at night, ending as late as 1:00 a.m.   On approximately 28% of all days she claimed to work, MONCLOVA claimed to have EIP sessions ending after 9:00 p.m.

74.   MONCLOVA also claimed to have worked an unrealistic number of days and hours.   During the period examined, MONCLOVA claimed to have worked approximately 96% of all possible days — averaging less than one day off every three weeks for approximately 43 continuous months.   Of the days she claimed to work, 24% had 10 or more hours in EIP sessions in a single day.   In 37% of weeks, MONCLOVA claimed to perform more than 51 hours in EIP sessions per week.

75.   The NYC DOHMH called the families of five children currently and previously served by MONCLOVA.   These calls revealed significant conflicts between MONCLOVA's claims and the parents' reports.   One parent claimed that MONCLOVA never came on Sundays or stayed past 4:30 p.m., but 7% of MONCLOVA's claims for this child were for Sunday EIP sessions and 9% of claims for this child were for services after 5:00 p.m.

76.     Another parent said that she had stopped using MONCLOVA because MONCLOVA was not delivering the required services.   This parent also stated that MONCLOVA did not provide the full two hours of services.   The parent further stated that MONCLOVA had asked the parent to sign stacks of one to two weeks' worth of EIP session notes at once.

77.     The NYC DOHMH conducted a follow-up analysis on MONCLOVA's records after the October 2018 Arrests.   In the eight months before the arrests, MONCLOVA claimed to have worked an average of 58 hours per week.   In the eight months after the arrests, MONCLOVA claimed an average of 39 hours per week.

78.     Similarly, in the eight months before the arrests, MONCLOVA claimed to work late-night EIP sessions on 29% of days she claimed to work.   In the eight months following the arrests, this percentage dropped to zero.   Further, in the eight months before the arrests, MONCLOVA claimed to work on 91% of Sundays.   In the eight months after the arrest, this percentage dropped to 8%.

79.     In the eight months before the arrests, MONCLOVA claimed to work 96% of all possible days.   In the eight months after the arrests, the percentage dropped to 80%, which is still an unusually high percentage.

80.     In the eight months before the arrests, MONCLOVA claimed to work ten or more hours per day on 53% of days she reported working.   This percentage dropped to 14% the month after the arrests, but by April 2019 the percentage had returned to 50%.

B.     Additional Evidence

81.     Law enforcement agents obtained historical location data for MONCLOVA's cellular telephone, which was identified as MONCLOVA's cellular telephone

based on, among other things, EIP employment records.   Law enforcement officers compared the historical location data associated with MONCLOVA's telephone to location information contained in the EIP session notes submitted by MONCLOVA.   Based on this review, agents determined that on more than 1,730 occasions, MONCLOVA was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

82.   Law enforcement officers reviewed telephone toll records for MONCLOVA's cellular telephone, which they identified as MONCLOVA's cellular telephone based on, among other things, EIP employment records, and determined that on at least 135 occasions MONCLOVA was using her cellular telephone during at least a quarter of the time period that she claimed to be performing a one-hour EIP therapy session.

83.   Law enforcement officers also interviewed the parents of children to whom MONCLOVA claimed to provide EIP therapy sessions.   During the interviews, the parents described the days of the week and hours of the day that MONCLOVA provided EIP services to their children.   Law enforcement officers compared the parents' statements to the hours of service that MONCLOVA billed for the children at issue and identified at least 350 occasions where MONCLOVA billed for EIP sessions on days and/or at times which the parents stated that EIP sessions did not occur. For example, one parent told law enforcement officers that MONCLOVA provided services to her child beginning at 11:15 or 11:30 a.m. However, MONCLOVA billed for more than 60 EIP sessions with this child that purportedly began at 7:00 p.m. or later.

84.   Law enforcement officers also obtained LPR records for a vehicle registered to MONCLOVA.   Law enforcement officers compared LPR records to the EIP invoices submitted by MONCLOVA and determined that on at least 700 occasions

MONCLOVA submitted an invoice for an EIP therapy session when LPR records reflected that his vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

VIII.    MANUEL MOORE

85.    During the course of this investigation, law enforcement officers determined that MANUEL MOORE, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   Between approximately September 2015 and June 2019, MOORE submitted fraudulent session notes and invoices and received payment for more than 6,735 non-existent EIP sessions, resulting in the improper disbursement of more than $693,000, including more than $246,000 in Medicaid funds and more than $447,000 in NYC DOHMH funds.

A.    Evidence from the NYC DOHMH Analysis

86.    The NYC DOHMH performed a preliminary analysis of MOORE's billing records for the period September 20, 2015 to November 16, 2018.

87.    MOORE claimed to work approximately 98% of all possible days during this period, averaging less than one day off every three weeks for almost three years.   Indeed, between May 8, 2016, and September 8, 2018, a period of 854 days, MOORE claimed to have worked every single day except January 4, 2018, with no other breaks, including holidays.

88.    Of the 150 weeks analyzed, MOORE claimed to provide approximately 51 hours or more in EIP sessions per week for 90 weeks.   And among the 1,027 days MOORE purported to work, he claimed to have performed more than 10 hours in EIP sessions in a single day on approximately 34% of days.

89.     The NYC DOHMH called the families of ten children currently and previously served by MOORE.   Several families contradicted MOORE's billing claims.   One family claimed that MOORE came for one hour per session, but MOORE consistently billed for two hours per session.   Another parent stated that MOORE came for two hours each session, but MOORE consistently billed for three hours per session.

90.     The NYC DOHMH's follow-up analysis showed that, after the October 2018 Arrests, MOORE's billing practices temporarily changed.   MOORE's average number of claimed hours worked per week dropped approximately 50% from the eight months before the arrests to the two months after the arrests.   By March and April 2019, however, MOORE's average claimed hours worked per week had returned to their previous levels.

91.     Similarly, in the seven months before the arrests, MOORE claimed to work every single day.   In the two months after the arrests, the percentage dropped to 80% and 87%.   But from December 2018 to April 2019, MOORE again claimed to work every single day.

B.     Additional Evidence

92.     Law enforcement agents obtained historical location data for MOORE's cellular telephone, which was identified as MOORE's cellular telephone based on, among other things, EIP employment records.   Law enforcement officers compared the historical location data associated with MOORE's telephone to location information contained in the EIP session notes submitted by MOORE.   Based on this review, agents determined that on more than 6,025 occasions, MOORE was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

93.      Law enforcement officers reviewed toll records for MOORE's cellular telephone, which they identified as MOORE's cellular telephone based on, among other things, EIP employment records, and determined that on at least 455 occasions MOORE was using his cellular telephone during at least a quarter of the time period that he claimed to be performing a one-hour EIP therapy session.

94.      Law enforcement officers also interviewed the parents of children to whom MOORE claimed to provide EIP therapy sessions.   During the interviews, the parents described the days of the week and hours of the day that MOORE provided EIP services to their children.   Law enforcement officers compared the parents' statements to the hours of service that MOORE billed for the children at issue and identified at least 300 occasions where MOORE billed for EIP sessions on days and/or at times which the parent stated that EIP sessions did not occur.   For example, one parent told law enforcement officers that MOORE provided services to her child beginning after 11:00 a.m. and before 6:00 p.m.   However, MOORE billed for more than 24 sessions with this child that purportedly began before 10:30 a.m. or after 7:00 p.m.

95.      Additionally, between approximately August 2013 and September 2016, MOORE was employed as a full-time teacher with the New York City Department of Education ("DOE").   Law enforcement officers reviewed DOE attendance records and determined that, on at least 115 occasions, MOORE submitted a fraudulent EIP invoice for a session that purportedly occurred during a time period when, according to DOE attendance records, MOORE was at work.   At least 15 of the EIP invoices were submitted for times that overlapped with times during which MOORE was affirmatively billing DOE for overtime hours worked outside of the usual school day.

96.     Law enforcement officers also obtained LPR records for a vehicle registered to MOORE.   Law enforcement officers compared LPR records to the EIP invoices submitted by MOORE and determined that on at least 1,650 occasions MOORE submitted an invoice for an EIP therapy session when LPR records reflected that his vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

IX.   KIKELOMO OGUNDIRAN

97.     During the course of this investigation, law enforcement officers determined that KIKELOMO OGUNDIRAN, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   Specifically, law enforcement officers determined that, between approximately January 2015 and April 2019, OGUNDIRAN submitted fraudulent session notes and invoices and received payment for more than 4,450 non-existent EIP sessions, resulting in the improper disbursement of more than $466,000, including more than $19,000 in Medicaid funds and more than $447,000 in NYC DOHMH funds.

A.     Evidence from the NYC DOHMH Analysis

98.     The NYC DOHMH performed a preliminary analysis of OGUNDIRAN's billing records for the period January 1, 2015 to July 31, 2018.

99.     During that period, OGUNDIRAN claimed to have EIP sessions beginning before 7:00 a.m. on 73% of days she claimed to work (with a high of 272 days in 2016).   OGUNDIRAN further claimed to have EIP sessions ending after 9:00 p.m. on 23% of days she claimed to work.

100.    In 2017, OGUNDIRAN claimed to conduct ten hours or more of EIP sessions per day on 46% of days.   For the period January 2018 to July 2018, OGUNDIRAN claimed to have conducted 10 hours or more of EIP sessions per day on 62% of days.

101.    The NYC DOHMH called the families of ten children previously served by OGUNDIRAN.   Several families contradicted OGUNDIRAN's billing claims.

102.    One family reported that OGUNDIRAN normally did not stay for the full two hours of the prescribed EIP sessions, but OGUNDIRAN consistently billed for two hour EIP sessions.   The parent further stated that OGUNDIRAN normally provided EIP sessions between noon and 2:00 p.m. and only came once on a weekend.   But 66% of all claims for this child indicate that the EIP session began before 11:00 a.m. or ended after 2:00 p.m. and 26% of the claims were for weekend days.

103.    Another family reported that OGUNDIRAN typically provided services between 10:00 a.m. and 1:00 p.m. and never provided services after 7:00 p.m. or on weekends. But 64% of OGUNDIRAN's claims for this family were for EIP sessions prior to 8:00 a.m. or after 8:00 p.m. and another 23% of claims were for EIP sessions supposedly occurring on weekends.

104.    Another family stated that OGUNDIRAN only provided 20 minutes per EIP session, not the two hours prescribed, and that OGUNDIRAN never came on weekends or holidays.   But OGUNDIRAN claimed numerous weekend EIP sessions.   OGUNDIRAN further claimed to have provided an EIP session on New Year's Day from approximately 6:00 a.m. to 8:00 a.m.

105.    The NYC DOHMH's follow-up analysis showed temporary changes in OGUNDIRAN's billing patterns following the October 2018 Arrests.   In the eight months

before the arrests, OGUNDIRAN claimed to perform an average of 10.2 hours in EIP sessions per day.   In the eight months after the arrests, she claimed to conduct only an average of 8.6 hours in EIP sessions per day.

106.    In the eight months before the arrests, OGUNDIRAN claimed to work 89% of Saturdays and 89% of Sundays.   In the eight months after the arrests, OGUNDIRAN only claimed to work 50% of Saturdays and 36% of Sundays.

107.    In the eight months before the arrests, OGUNDIRAN claimed to have EIP sessions beginning before 7:00 a.m. on 68% of days she claimed to have worked.   That percentage dropped to 48% the month after the arrests and to 0% for the months thereafter.

108.    However, the analysis suggests OGUNDIRAN returned to her previous patterns.   In the eight months before the arrests, OGUNDIRAN claimed to work on 93% of all possible days.   This percentage dropped to 79% in the months after the arrests, but by April 2019, she again claimed to have worked 93% of all days.

B.    Additional Evidence

109.    Law enforcement agents obtained historical location data for OGUNDIRAN's cellular telephone, which was identified as OGUNDIRAN's cellular telephone based on, among other things, EIP employment records.   Law enforcement officers compared the historical location data associated with OGUNDIRAN's telephone to location information contained in the EIP session notes submitted by OGUNDIRAN.   Based on this review, agents determined that on more than 3,430 occasions, OGUNDIRAN was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

110.   Law enforcement officers reviewed toll records for OGUNDIRAN's cellular telephone, which they identified as OGUNDIRAN's cellular telephone based on, among other things, EIP employment records, and determined that on at least 385 occasions OGUNDIRAN was using her cellular telephone during at least a quarter of the time period that she claimed to be performing a one-hour EIP therapy session.

111.   Law enforcement officers also interviewed the parents of children to whom OGUNDIRAN claimed to provide EIP therapy sessions. During the interviews, the parents described the days of the week and hours of the day that Ogundiran provided EIP services to their children.   Law enforcement officers compared the parents' statements to the hours of service that Ogundiran billed for the children at issue and identified at least 100 occasions where Ogundiran billed for EIP sessions at times that parents stated that EIP sessions did not occur.   For example, one parent told law enforcement officers that her child did not receive any services at home in the mornings because the child attended school until 1:30 p.m. However, OGUNDIRAN billed for more than 65 sessions with this child at or before 1:00 p.m.

112.   Law enforcement officers also reviewed OGUNDIRAN'S travel records and determined that, on at least 300 occasions, OGUNDIRAN submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when OGUNDIRAN was, in fact, either outside of New York or in air transit.

113.   Law enforcement officers also obtained LPR records for a vehicle registered to OGUNDIRAN.   Law enforcement officers compared LPR records to the EIP invoices submitted by OGUNDIRAN and determined that on at least 570 occasions OGUNDIRAN submitted an invoice for an EIP therapy session when LPR records reflected

that his vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

X.   DINO PAOLICELLI

114.   During the course of this investigation, law enforcement officers determined that DINO PAOLICELLI, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   Specifically, law enforcement officers determined that, between approximately January 2016 and May 2019, PAOLICELLI submitted fraudulent session notes and invoices and received payment for more than 1,620 non-existent EIP sessions, resulting in the improper disbursement of more than $163,000, including more than $48,000 in Medicaid funds and more than $115,000 in NYC DOHMH funds.

A.   Evidence from the NYC DOHMH Analysis

115.   The NYC DOHMH performed a preliminary analysis of PAOLICELLI's billing records for the period January 1, 2016 to December 31, 2018.

116.   On approximately 58% of days PAOLICELLI claimed to work, he claimed to have an EIP session ending after 9:00 p.m., including EIP sessions ending as late as 10:45 p.m., and often including multiple late-night EIP sessions in a single day.   For example, PAOLICELLI claimed to have conducted approximately 399 late-night EIP sessions in 2016, approximately 429 late-night EIP sessions in 2017 and approximately 252 late-night EIP sessions in 2018.

117.   During the period examined, PAOLICELLI claimed to work a total of 1,086 days out of 1,096 days possible — three years straight with only 10 days off.   He also claimed to have conducted 51 hours or more in EIP sessions per week in 141 out of 156 of

those weeks.   On 73% of days he claimed to work, PAOLICELLI claimed to provide 10 hours or more in EIP sessions per day.

118.   The NYC DOHMH called the families of eight children previously served by PAOLICELLI.   These calls revealed significant discrepancies.

119.   One family reported no morning EIP sessions and stated that EIP sessions always ended by 9:00 p.m., the child's bedtime.   PAOLICELLI, however, billed for 78 EIP sessions beginning at 9:00 p.m. or later and 39 EIP sessions supposedly starting at 7:30 a.m.

120.   Another family reported that all of PAOLICELLI's visits were 60 or 90 minutes long, but PAOLICELLI billed for 120 minutes in EIP sessions for each visit.

121.   Another parent complained to NYC DOHMH in 2018 that PAOLICELLI was inconsistent, cancelled often and had asked her to sign blank EIP session notes (which is not permitted by EIP rules).   This parent reported that she had confirmed with PAOLICELLI's agency that PAOLICELLI had billed and been paid for days when services had not been provided.   This parent also reported that PAOLICELLI was often on the telephone during EIP sessions and that PAOLICELLI would rip up EIP session notes when the family insisted on writing dates on them.

122.   In one exchange with this family, the family texted PAOLICELLI to state that they wanted to limit weekend EIP sessions to two hours.   PAOLICELLI responded, "Ok no problem."   Yet on that weekend and every weekend until his services to that family ended, PAOLICELLI billed for eight hours of service.

123.   The NYC DOHMH's follow-up analysis showed that subsequent to the October 2018 Arrests, PAOLICELLI's billing practices changed to some degree.   In the eight

months before the arrests, PAOLICELLI claimed to work an average of 11.2 hours per day, while in the eight months after the arrests, he claimed to work 7.8 hours per day.   Similarly, in the eight months before the arrests, PAOLICELLI claimed to provide 10 hours in EIP sessions or more than 80% of days.   In the eight months after the arrests, this rate fell to 34%.

124.   In the eight months before the October 2018 Arrests, PAOLICELLI claimed to have worked every day but one.   This rate dropped slightly after the arrests, but in September 2018, November 2018, December 2018 and April 2019, he again claimed to have worked every single day of the month.

B.   Additional Evidence

125.   Law enforcement agents obtained historical location data for PAOLICELLI's cellular telephone, which was identified as PAOLICELLI's cellular telephone based on, among other things, EIP employment records.   Law enforcement officers compared the historical location data associated with PAOLICELLI's telephone to location information contained in the EIP session notes submitted by PAOLICELLI.   Based on this review, agents determined that on more than 1,480 occasions, PAOLICELLI was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

126.   Law enforcement officers reviewed toll records for PAOLICELLI's cellular telephone, which they identified as PAOLICELLI's cellular telephone based on, among other things, EIP employment records, and determined that on at least 115 occasions PAOLICELLI was using his cellular telephone during at least a quarter of the time period that he claimed to be performing an EIP therapy session.

127.   Law enforcement officers reviewed PAOLICELLI's bank account records and determined that, on more than 125 occasions, PAOLICELLI billed for an EIP

therapy session on days that his bank records indicated he was making purchases outside of New York State.

XI.   REQUEST FOR SEALING

128.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application itself.   I believe that sealing these documents is necessary to preserve the integrity of this ongoing criminal investigation.   Based upon my training and experience, I have learned that criminals actively search online for criminal affidavits and arrest warrants via the Internet, and disseminate them to other criminals as they deem appropriate.   Premature disclosure of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

WHEREFORE, your deponent respectfully requests that the defendants MARSISTE ADOLPHE, MARGARET DOMINIQUE-MCLAIN, MERCEDES FALCON, TRACY GIBSON, ROSELEE JOHNSON, JEANNETTE MONCLOVA, MANUEL

36

MOORE, KIKELOMO OGUNDIRAN, and DINO PAOLICELLI be dealt with according to

law.

ANGEL AGESTA
Special Agent, Federal Bureau of Investigation

Sworn to before me via telephone this
22 day of October, 2021

Ramon E. Reyes, Jr.    Digitally signed by Ramon E. Reyes, Jr.
                       Date: 2021.10.22 16:57:02 -04'00'

THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK